UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

MAGNA CHARTER, LLC,                            :
individually and on behalf of all others similarly   :
situated,                                      :
                                               :
                    Plaintiff,                 :     Civil Action No.
                                               :
         v.                                    :     COMPLAINT – CLASS ACTION
                                               :
BOATS GROUP, LLC, a Florida Limited Liability  :
Company, PERMIRA ADVISERS, LLC, a New          :
York Limited Liability Company, YATCO, LLC, a  :
Florida Limited Liability Company,             :
INTERNATIONAL YACHT BROKER'S                   :     JURY TRIAL DEMANDED
ASSOCIATION, INC., a Florida not for Profit    :
Corporation, YACHT BROKER'S                    :
ASSOCIATION OF AMERICA, a Maryland             :
Corporation, UNITED YACHT SALES, LLC, a        :
Florida Limited Liability Company, DENISON     :
YACHT SALES, INC., a Florida Corporation,      :
DENISON NEW YACHTS, LLC, a Florida             :
Limited Liability Company, NORTHROP &          :
JOHNSON YACHT SALES, LLC, a Florida            :
Limited Liability Company, HMY YACHT SALES,    :
INC., a Florida Corporation, GALATI YACHT      :
SALES, LLC, a Florida Limited Liability Company,:
HMY YACHT SALES, INC., a Florida               :
Corporation, MARINEMAX, INC., a Florida        :
Corporation, SHARON & JACK MALATICH,           :
LLC, a Maryland Limited Liability Company,      :
TOURNAMENT YACHT SALES, LLC, a Florida         :
Limited Liability Company, RJC YACHT SALES,    :
INC., a Florida Corporation, THE MULTIHULL     :
COMPANY, LLC, a Pennsylvania Limited Liability :
Company, SUNSHINE CRUISING YACHTS              :
LLC a Florida Limited Liability Company, and    :
Catamaran Sales, Inc., a Florida Corporation.   :
                                               :
                    Defendants.                :

## CLASS ACTION COMPLAINT

Plaintiff Magna Charter, LLC, on behalf of itself individually and on behalf of all others similarly situated (the "Class" as defined below), brings this class action to recover injunctive relief, treble damages, and other relief as is appropriate, based on Defendants' conspiracy requiring Plaintiff and the Class to pay inflated commissions to brokers in connection with the sale of a vessel, boat, or yacht (collectively referred to herein as a "Yacht"), on one of the Covered Multiple Listing Services (the "Yacht MLSs").

The allegations in this Complaint are based upon personal knowledge as to the facts pertaining to Plaintiff and upon information and belief and based on the investigation of counsel as to all other matters.

## NATURE OF THE ACTION

1.      Defendants have controlled the market for Yacht brokerage services and enforced rules dominating the Yacht brokerage industry. Significantly, brokers require (1) sellers to pay a supracompetitve commission set as a percentage of the closing price on the sale of a Yacht, and (2) payment of part of that commission to the broker representing the buyer in the deal. These rules are referred to herein as the "Broker Rules."

2.      Defendants and their Broker Rules have for years caused Yacht sellers to pay inflated commissions and a portion of such commissions to the buyer-broker, someone who provided no service whatsoever to the sellers.

3.      Similar practices have long dominated the real estate industry,[1] and, in October 2023, a Missouri jury found the National Association of Realtors ("NAR") and certain real estate

---

[1] *See Nosalek v. MLS Property Information Network, Inc., et al.*, No. 1:20-cv-12244-PBS (D. Mass), ECF No. 230.

brokerages liable for $1.8 billion in damages (before trebling) for conspiring to fix and maintain commission arrangements in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.[2]

4.      Subject to court approval, NAR has agreed to pay $418 million as part of a national settlement agreement to resolve all claims concerning its anticompetitive practices.[3] As part of the settlement, NAR has agreed to implement the following two significant changes:

      a.   It will prohibit seller-brokers from offering buyer-brokers commissions through its MLS sites; and

      b.   Buyer-brokers will be required to enter into buyer representation agreements that spell out the compensation they will receive from buyers.[4]

5.      This same anticompetitive practice has existed for decades in the Yacht brokerage industry.

6.      Defendants have conspired to charge Yacht sellers an inflated commission rate, commonly 10% of the purchase price of the Yacht, whereas realtors have charged a commission of 5-6%.

7.      Defendants have enforced the Broker Rules through their tight control over the Yacht MLSs and the International Yacht Broker's Association, Inc.'s ("IYBA") and Yacht Broker's Association of America, Inc.'s ("YBAA")  anticompetitive so-called "ethics" rules (see below).

---

[2] *See The Way You Pay to Buy or Sell a Home Is About to Change*, Nicole Friedman, The Wall Street Journal, Nov. 1, 2023 https://www.wsj.com/finance/investing/the-way-you-pay-to-buy-or-sell-a-home-is-about-to-change-4e1a4fbc (last visited March 25, 2024).
[3] *See* National Association of REALTORS® Reaches Agreement to Resolve Nationwide Claims Brought by Home Sellers, https://www.nar.realtor/newsroom/nar-reaches-agreement-to-resolve-nationwide-claims-brought-by-home-sellers (last visited March 24, 2024).
[4] The Truth About the NAR Settlement Agreement, https://www.nar.realtor/magazine/real-estate-news/law-and-ethics/the-truth-about-the-nar-settlement-agreement (last visited March 25, 2024).

8.    Like real estate listing services are online databases compiling information for real estate transactions, the Yacht MLSs are databases created when multiple Yacht brokers come together to share their listings in a single place. They are necessary so that buyers, sellers, and brokers can access critical information for sellers to list Yachts for sale and for buyers to shop for Yachts.

9.    Boats Group, LLC ("Boats Group") owns three of the largest Yacht MLSs, Boat Trader, YachtWorld, and Boats.com. Yatco, LLC ("Yatco") owns another large Yacht MLS, Yatco. The IYBA owns yachtbroker.org, one of the largest Yacht MLSs in the country. Defendants have conspired with Boats Group, Yatco, and the IYBA to control the Yacht MLSs and to enforce the Broker Rules.

10.    Defendants have structured Yacht MLSs to conceal information from the public. That gives brokers an unfair advantage and supracompetitive commissions, and effectively keeps sellers from entering into private, i.e., non-brokered, transactions.

11.    Specifically, Defendants have structured the Yacht MLSs such that only other brokers will see the commission it will earn if they land a buyer. This incentivizes buyer-brokers to only show their clients Yachts that offer the brokers a higher commission.

12.    The result is that Yacht sellers must pay not only a commission that in a competitive market would be paid by the buyer but an inflated commission at that.

13.    Without the Broker Rules, sellers would pay a lower total commission and Yacht buyers would pay their own brokers.

14.    Because the commission paid to the buyer-broker is set by the seller-broker and not subject to negotiation between the buyer and a buyer-broker, the Broker Rules prevent any competition among buyer-brokers based on their commission rate.

4

15.     The Broker Rules are pervasive in the industry, and it is virtually impossible for buyers and sellers of Yachts to avoid them and to avoid paying supracompetitive commissions on the sale of Yachts.

16.     These artificially-inflated commissions are all the more egregious given the role of buyer-brokers has become less important as more and more prospective Yacht buyers utilize websites like YachtWorld to shop for a Yacht.

17.     Well aware of the diminishing role of buyer-brokers, Defendants have conspired to ensure that sellers continue to pay buyer-broker commissions and to maintain the practice of splitting the 10% commission.

18.     Plaintiff, on behalf of itself and the Class, seeks treble damages, injunctive relief, and the costs of this lawsuit, including attorneys' fees, for Defendants' violation of federal antitrust law.

## **PARTIES**

19.     Magna Charter, LLC ("Magna Charter") is a limited liability company that in 2021 used a Yacht MLS to sell a Yacht and was required to pay a commission to a broker affiliated with one of the Defendants.

20.     Defendant Boats Group owns and operates the largest Yacht MLSs. Boats Group also owns BoatWizard, which is exclusive to brokers and dealers and interfaces with each of Boats Group's MLS pages. Boats Group also owns and operates YachtCloser.com, which offers draft brokerage contracts for Yacht brokers. Boats Group collects substantial listing fees from brokerages located in Florida and advertises and does substantial business in Florida. Through its various MLS pages, Boats Group lists thousands of Yachts for sale in Florida. Boats Group is headquartered in Miami, Florida.

21.     Defendant Permira Advisers LLC ("Permira") wholly owns and operates Boats Group. Through Boats Group, and other ventures, Permira regularly does business in Florida. Permira is headquartered in New York, New York.

22.     Defendant Yatco owns and operates one of the largest Yacht MLS pages, named YATCO. YATCO collects substantial listing fees from brokerages located in Florida and advertises and does substantial business in Florida. YATCO regularly lists hundreds, if not thousands of Yachts for sale in Florida. YATCO is headquartered in Parkland, Florida.

23.     Defendant IYBA has over 1,900 members and is the largest Yacht brokers association in the country. It has collected substantial dues and membership fees during the Class Period, including substantial amounts from brokers in Florida. IYBA has a significant lobbying presence, advocating for the interest of Yacht brokers. IYBA also owns yachtbroker.org, one of the largest Yacht MLSs in the country. IYBA is headquartered in Miami, Florida and several of its officers and directors are located in Florida.

24.     Defendant YBAA has more than 250 firms as members representing over 1,000 Yacht brokers. It has collected substantial dues and membership fees during the Class Period, including substantial amounts from brokers in Florida. YBAA has a significant lobbying presence, advocating for the interest of Yacht brokers in Florida. YBAA regularly does substantial business in Florida. Its vice president and board of directors are located in Florida. YBAA is headquartered in Annapolis, Maryland.

25.     Defendant United Yacht Sales, LLC ("United") is one of the largest Yacht brokerages in the world. United has over 250 Yacht brokers in 104 different locations worldwide, including over 100 Yacht brokers in Florida. United regularly sells Yachts in Florida and collects

brokerage commissions from Yachts sold in Florida. It wholly owns and operates each of these brokerages. United is headquartered in Stuart, Florida.

26.     Defendants Denison Yacht Sales, Inc. and Denison New Yachts, LLC (together, "Denison") operate a large Yacht brokerage. Denison has several brokers in Florida and does substantial advertising and business in Florida. Denison regularly sells Yachts in Florida and collects brokerage commissions from Yachts sold in Florida. Denison is headquartered in Dania Beach, Florida.

27.     Defendant Northrop & Johnson Yacht Ships, LLC ("Northrop & Johnson") is a large Yacht brokerage. Northrup & Johnson has several brokers in Florida and does substantial advertising and business in Florida. Northrup & Johnson regularly sells Yachts in Florida and collects brokerage commissions from Yachts sold in Florida. Northrup & Johnson is headquartered in Fort Lauderdale, Florida.

28.     Defendant Galati Yacht Sales, LLC ("Galati") is a large Yacht brokerage. Galati has several brokers in Florida and does substantial advertising and business in Florida. Galati regularly sells Yachts in Florida and collects brokerage commissions from Yachts sold in Florida. Galati is headquartered in Anna Maria, Florida.

29.     Defendant HMY Yacht Sales, Inc. ("HMY") is a large Yacht brokerage. HMY has several brokers in Florida and does substantial advertising and business in Florida. HMY regularly sells Yachts in Florida and collects brokerage commissions from Yachts sold in Florida. HMY is headquartered in Palm Beach Gardens, Florida.

30.     Defendant Allied Marine, Inc. ("Allied Marine") is a large Yacht brokerage. Allied Marine has several brokers in Florida and does substantial advertising and business in Florida.

Allied Marine regularly sells Yachts in Florida and collects brokerage commissions from Yachts sold in Florida. Allied Marine is headquartered in Fort Lauderdale, Florida.

31.    Defendant MarineMax, Inc. ("MarineMax") is a large Yacht brokerage and dealer. MarineMax has several brokers in Florida and does substantial advertising and business in Florida. MarineMax regularly sells Yachts in Florida and collects brokerage commissions from Yachts sold in Florida. MarineMax is headquartered in Clearwater, Florida.

32.    Defendant Sharon & Jack Malatich, LLC, D/B/A S&J Yachts ("S&J Yachts") is a large Yacht brokerage. S&J Yachts is headquartered in Rock Hall, Maryland, and does substantial business in Florida. S&J Yachts has brokers in Florida and collects substantial brokerage commissions from Yachts sold in Florida. S&J Yachts has offices located in Florida, including Palmetto, Stuart, and Fort Lauderdale.

33.    Defendant Tournament Yacht Sales, LLC ("Tournament Yacht") is a Yacht brokerage. Tournament Yacht has several brokers in Florida and does substantial advertising and business in Florida. Tournament Yacht regularly sells Yachts in Florida and collects brokerage commissions from Yachts sold in Florida. Tournament Yacht is headquartered in Tequesta, Florida.

34.    Defendant R.J.C. Yacht Sales, Inc. ("RJC Yacht") is a Yacht brokerage. RJC Yacht has several brokers in Florida and does substantial advertising and business in Florida. RJC Yacht regularly sells Yachts in Florida and collects brokerage commissions from Yachts sold in Florida. RJC Yacht is headquartered in Fort Lauderdale, Florida.

35.    Defendant The Multihull Company, LLC ("Multihull") is a Yacht brokerage. Multihull has several offices and brokers in Florida and does substantial business in Florida.

8

Multihull regularly sells Yachts in Florida and collects brokerage commissions from Yachts sold in Florida. Multihull is headquartered in Philadelphia, Pennsylvania.

36.     Defendant Sunshine Cruising Yachts LLC ("Sunshine Cruising") is a Yacht brokerage based in Florida and does substantial business in Florida. Sunshine Cruising regularly sells Yachts in Florida and collects brokerage commissions from Yachts sold in Florida. Sunshine Cruising is headquartered in Saint Augustine, Florida.

37.     Defendant Catamaran Sales, Inc. ("Catamaran Sales") is a Yacht brokerage. Catamaran Sales has several offices and brokers in Florida. Catamaran Sales regularly sells Yachts in Florida and collects brokerage commissions from Yachts sold in Florida. Catamaran Sales is headquartered in Fort Lauderdale, Florida.

38.     Defendants United, Denison, Northrop & Johnson, Galati, HMY, Allied Marine, S&J Yachts, Tournament Yacht, MarineMax, RJC Yacht, Multihull, Sunshine Cruising, and Catamaran Sales are collectively referred to as the Brokerage Defendants.

## UNNAMED CO-CONSPIRATORS

39.     Unnamed co-conspirators include others who acted in concert with Defendants as to the anticompetitive conduct alleged herein.

## JURISDICTION AND VENUE

40.      Subject matter jurisdiction exists over this action under 15 U.S.C. §§ 4, 16 and under 28 U.S.C. §§ 1331, 1337.

41.     The Court has personal jurisdiction over Defendants under 15 U.S.C. § 22, which permits nationwide service of process.

42.     Venue is proper in this district under 28 U.S.C. § 1391(b), (c) and (d). Every Defendant transacted business, was found, had agents, and or/resided in this District, a

substantial part of the events giving rise to Plaintiff's claims arose in this District, and a substantial portion of the affected interstate trade and commerce described herein was carried out in this District.

## **FACTUAL BACKGROUND**

### I.     **The Yacht Brokerage Industry**

43.     Like the real estate brokerage industry, Yacht brokers earn commissions by representing a buyer, a seller, or both, in a sale transaction.

44.     In the real estate industry, that commission percentage is uniform across the country and for decades home sellers have paid a commission of approximately 5-6%, which is generally shared equally by the buyer-broker and seller-broker regardless of the relative efforts expended by them.

45.     Similarly, in the Yacht brokerage industry, the seller is required to pay a non-negotiable commission not only to the seller-broker but also to the buyer-broker, who provided no services whatsoever to the seller.

46.     In a typical Yacht sale transaction, the seller retains a broker to market a Yacht and to represent the seller in the transaction. In exchange for such services, the seller must pay the seller-broker a commission of 10%, about twice as high as residential real estate commissions.

47.     If the buyer is represented by a buyer-broker, the buyer-broker and seller-broker enter into an agreement to share the 10% commission, often equally.

48.     In this scenario, the seller pays the entire buyer-broker commission and, for this reason, Yacht brokers often represent to prospective buyers that the services of a buyer-broker are free.[5]

---

[5] Boat Buyer Representation, https://www.sailonline.com/boat-ownership/boat-buyers/used-yacht-buyer (last visited March 25, 2024) ("Let's begin with the most compelling benefit: It is absolutely FREE to the buyer.").

49.     The seller pays the buyer-broker's commission even though the buyer-broker performed no service for the seller and in fact represented the seller's adversary in the transaction.

50.     A Yacht owner has a few options when trying to sell a Yacht. The most common option, and the one most promoted by Defendants, is for the seller to retain a seller-broker and sign a "Central Listing Agreement."[6]

51.     A Central Listing Agreement provides that a broker will have the exclusive right to market the Yacht for sale and, in exchange, the seller promises to pay the broker a commission based on a percentage of the sale price, "which is typically 10%."[7]

52.     The benefit of a central listing agreement for the seller is that the broker will list the Yacht for sale on one of the Yacht MLSs, such as yachtworld.com, which "functions much like the Multiple Listing Service (MLS) of the real estate brokering community."[8]

53.     These agreements require the seller to pay the 10% commission even if the seller ends up finding a buyer completely on its own and the broker does nothing to market and sell the Yacht.[9]

54.     The other options for a seller are to choose an "open listing agreement" or to sell the Yacht without a broker. Defendants discourage sellers from these options, characterizing them as undesirable.

---

[6] *See* Listing Agreements, https://anchoryachts.com/listing-agreements/ (last visited March 25, 2024)) ("The most convenient and most effective way to list your boat for sale is to let us handle everything under a Central Listing.").
[7] Yacht Broker Agent Fees Explained, https://www.yatco.com/yacht-broker-agent-fees-explained/ (last visited March 25, 2024; Buying from a Yacht Broker: Commissions, Escrow, Accounts, Taxes, and More, https://www.yachtworld.com/research/buying-from-a-yacht-broker-commissions-escrow-accounts-taxes-and-more/ (last visited March 25, 2024).
[8] A Yacht Broker to Navigate You Through the Process, https://www.marinemax.com/boats-and-yachts/brokerage/brokerage-process (last visited March 25, 2024).
[9] *Id.* ("Remember, that in this type of agreement, if you bring the buyer or even ending up donating your yacht, you are still liable for the broker's commission.")

55.     In an open listing agreement, there is no exclusivity; the seller can give any broker the right to market and sell the Yacht in exchange for a commission, and the seller can still try to sell the Yacht on its own.

56.     In these arrangements, because multiple brokers (and the buyer) are competing to sell the same Yacht, no broker is guaranteed to earn a commission. Brokers typically do not invest the same time and resources to market Yachts that are on open listing agreements, because there is no guarantee of a commission.

57.     Sellers can also attempt to sell their Yachts without a seller-broker. While the seller will be able to avoid paying a seller commission on this type of transaction, most sellers understand that they have no choice but to pay the buyer-broker's commission in order to close the deal.

58.     Prospective Yacht buyers similarly enter into contracts with brokers, and such contracts provide that the buyer-broker will receive its commission as a percentage of the sale price of the Yacht to be paid by the seller at closing.

59.     Because the seller is the one who pays the buyer-broker its commission at closing, buyers do not negotiate with buyer-brokers over the amount of the commission that a buyer-broker will receive in exchange for representing the buyer.

## II.     Defendants Exercise Tight Control over the Yacht MLSs and Use Them to Enforce the Broker Rules.

60.     Yacht brokers use this control over the Yacht MLSs to ensure that only fellow Yacht brokers can post Yachts for sale on Yachts MLSs.[10]

---

[10] Sell Your Boat,
https://www.yachtworld.com/core/fsbo/addFsboAd.jsp#:~:text=To%20have%20your%20boat%20presented,owner%
2Fseller%20such%20as%20yourself (last visited March 25, 2024) ("To have your boat presented on the
YachtWorld.com site, we require that you use the services of a professional yacht broker. YachtWorld advertising
services are only available to yacht brokerage firms and dealerships representing multiple boats for sale on behalf of
an owner/seller such as yourself. We do not offer services directly to the individual owner/seller.").

61.     As in real estate, where MLSs provide the source data for websites such as Zillow or Redfin, the Yacht MLSs provide the source data for listing websites such as YachtWorld or Yachtbroker.org. As a result, other brokers and prospective buyers are unlikely to learn about a Yacht that is not listed on a Yacht MLS.

62.     Listings on Yacht MLSs include basic information about the Yacht (size, price, manufacturer, engine horsepower, etc.) that is publicly available to anyone and certain information that is only visible to other brokers.

63.     A listing on a Yacht MLS will show a broker the commission it could earn from facilitating the sale of the Yacht by representing a buyer and providing sales information on the Yacht's prior sales. Unlike in real estate, this sales information is kept confidential by Defendants even though such information is vital for determining the fair market value of a Yacht, no different from determining the fair market value of a home.

64.     Yacht brokers go to great lengths to maintain the confidentiality of this important sales data. Once a Yacht is sold, YachtWorld requires brokers to input the sold price data to soldboats.com.

65.     YachtWorld prohibits Yacht brokers from publishing any data from soldboats.com, preventing the public from learning this pricing data, which artificially increases the value and thus demand for Yacht brokers.

66.     Yatco, one of the largest Yacht MLSs "only publishes Central Listings.[11] Yatco says the reason it does this to "protect the interests of both the buyer/seller and the professional broker. Only publishing Central Listings maintains both price integrity and the trusted relationship between seller/buyer and broker."[12]

---

[11] Frequently Asked Questions, https://www.yatco.com/faqs/ (last visited March 25, 2024).
[12] *Id*.

67.     Stated differently, Yatco does not permit open listings on its MLS where (1) a

seller-broker might not receive a commission if the seller sells the Yacht on its own, and (2) there

is not full transparency informing a buyer-broker what commission it will receive.

68.     Defendant MarineMax explains the situation more directly, describing how

YachtWorld enforces the Broker Rules:

> Brokers have exclusive access to websites such as
> YachtWorld.com, which has become the gold standard for
> searching from anywhere in the world. It functions much like the
> Multiple Listing Service (MLS) of the real estate brokering
> community. This is important. *By listing on YachtWorld, your
> broker has agreed to sell it through a co-brokerage agreement that
> requires your broker to split the typically 10-percent commission
> with the buyer's broker*. About 70-percent of all brokerage sales are
> co-brokered. Remember, that in this type of agreement, if you
> bring the buyer or even ending up donating your yacht, you are
> still liable for the broker's commission.[13]

69.     This means that to get access to the single most important tool to sell a Yacht, a

seller must (1) retain a seller-broker, and (2) agree that the seller-broker will charge a 10%

commission and share half of that commission with the buyer-broker.

70.     Defendants also make it difficult to join their exclusive club and gain access to the

Yacht MLSs as a broker. YachtWorld has strict membership requirements. Yacht brokers must:

(1) show proof they are a broker;

(2) be licensed by the state where they reside if there is such a requirement in that state;

(3) have a business license in the name of the broker's proposed Yachtworld account

name;

---

[13] Why Use a Broker? Advantages of Using a Broker, https://www.marinemax.com/boats-and-
yachts/brokerage/advantages-of-a-broker (last visited March 25, 2024) (emphasis added).

(4) have a minimum of three Yachts for sale that (i) are over 25 feet long or over $30,000,

(ii) are central listings, (iii) are available for co-brokerage[14]; (iv) have a signed listing

agreement, (v) are not owned by the member, and (vi) are not already listed on

Yachtworld;

(5) include in their listings a photo of the Yacht for sale, a description of the Yacht, and

information describing the broker's business; and

(6) agree to the Member Service Agreement and Policies.[15]

71.     The requirements that a prospective broker have three Yacht listings available for

co-brokerage, and that are central listings, further enforce the Broker Rules.

72.     Boats Group's Member Service Agreement and Policies also enforce the Broker

Rules by (1) requiring that listings identify whether they are available for co-brokerage;

(2) prohibiting listings from including customer-specific contact information or information that

can be used "to thwart co-brokerage activity;" and (3) requiring that to maintain access to

YachtWorld, the broker must always have three Yachts "or 75% of Customer's inventory . . .

available for co-brokerage, whichever is greater."[16]

III.     **The Anticompetitive IYBA and YBAA Rules**

73.     The YBAA and IYBA have both created rules under the pretext of "ethics" to

ensure that the Broker Rulers are enforced and maintained.

74.     The YBAA includes rules that require seller-brokers to share their commissions

with buyer-brokers:

---

[14] "Available for co-brokerage" in this context means that the seller-broker will split the commission with the buyer-broker. Co-Brokerage: What the Yacht Buyer Needs to Know, https://www.yachtworld.com/research/co-brokerage-what-the-yacht-buyer-needs-to-know/ (last visited March 25, 2024).
[15] Eligibility Requirements for Membership, https://www.yachtworld.com/core/members/eligibility.jsp (last visited March 25, 2024).
[16] Boats Group Service Agreement and Policies, https://www.boatsgroup.com/service-agreement-and-policies/ (last visited March 25, 2024).

3.3 The Broker will cooperate with other Brokers on vessels listed by him/her on a Central Listing Basis whenever it is in the interest of the Seller, *sharing commissions on a previously agreed basis*. Negotiations concerning vessels listed on a Central Listing basis will be carried on with the listing Broker, not with the Seller, except with consent of the listing Broker.

3.4 When a Broker obtains a Central Listing, he/she will endeavor to distribute the listing to corresponding Brokers as quickly as possible. *Central Listings and shared Open Listings are generally shared on a commission basis, agreed to beforehand as a matter of policy, or agreed upon by the cooperating parties negotiated on a particular sale*. Should the central or loaning Broker show the boat or perform work above and beyond the customary effort of providing the listing and negotiating with the Seller, the commission arrangements should be reconsidered by the parties involved.[17]

75.    The IYBA has a similar rule:

Section 17. Members should cooperate with other members on vessels listed with him whenever it is in the interest of the client. Negotiations concerning a vessel listed exclusively with one member should be carried on with the listing broker, not the owner, except with the express consent of the listing member. *All shared commission agreements should be negotiated prior to the submission of any Offer to Purchase*.[18]

76.    These rules mean that when a seller-broker has a Yacht for sale, the seller-broker and buyer-broker must first agree on how they are going to allocate the 10% commission among themselves before they actually engage in any negotiation over the Yacht for sale.

77.    They also enforce the practices of the Yacht MLSs to list in a field only viewable to other brokers the percentage of a commission that a buyer-broker will receive on a deal.

---

[17] YBAA, CODE OF ETHICS & BUSINESS PRACTICE 5 (July 12, 2021), https://www.ybaa.yachts/aws/YBAA/asset_manager/get_file/50088?ver=21578 (last visited March 25, 2024) (emphasis added).
[18] IYBA, Bylaws of the Florida Yacht Brokers Association, Inc., https://iyba.org/bylaws#:~:text=It%20is%20the%20duty%20of,of%20the%20yacht%20brokerage%20profession (last visited March 24, 2024) (emphasis added).

78.     These rules and disclosure practices ensure that seller-brokers will offer buyer-brokers a sufficient commission to entice buyer-brokers to advertise their Yachts.

79.     Many buyer-brokers will not show a Yacht yielding a lower buyer-broker commission or will show other Yachts first.

80.     In the absence of these "ethical rules" and their further enforcement through the Yacht MLSs, brokers would compete against one another by offering sellers lower commissions.

81.     The Broker Rules render impossible open competition on commissions by both seller-brokers and buyer-brokers.

82.     The IYBA and YBAA require their members to comply with such rules and will expel members that do not comply.[19]

83.     Defendants also enforce the Broker Rules through the form agreements that they provide to brokers as a benefit of membership, such as through Yachtcloser.com.

84.     The YBAA's standard central listing agreement includes the following features:

   a.   The seller-broker "may act as a dual-agent, representing both owner and buyer, in a purchase and sale transaction if BUYER is not represented by his/her own BROKER;" and

   b.   "To pay any Corresponding Broker who sells the VESSEL, a percentage of the commission."[20]

85.     The result of these provisions is that the seller-broker can keep the entire commission originally intended to pay both the seller-broker and the buyer-broker even if there

---

[19] *See* IYBA, Bylaws of the Florida Yacht Brokers Association, Inc., https://iyba.org/bylaws#:~:text=It%20is%20the%20duty%20of,of%20the%20yacht%20brokerage%20profession (last visited March 25, 2024); YBAA, CODE OF ETHICS & BUSINESS PRACTICE 2-3 (July 12, 2021).
[20] Vessel Brokerage Central Listing Agreement ("Agreement"), https://www.bluenoseyachts.com/wp-content/uploads/2021/12/2020-us_central_listing_agreement.pdf (last visited March 25, 2024).

is no buyer-broker and to leave it to the seller-broker to set the amount of the buyer-broker commission.

**IV.     Brokerage Defendants Designed, Implemented and Participated in the Conspiracy.**

86.     Brokerage Defendants have furthered the alleged conspiracy by (1) requiring their brokers comply with the IYBA and YBAA rules that have facilitated and maintained the Broker Rules; and (2) having their executives manage IYBA and YBAA operations, including enforcing the "ethical rules" and the Broker Rules.

87.     Brokerage Defendants have agreed that their brokers would follow the IYBA's and YBAA's rules, including the rules that maintain and enforce the Broker Rules.

88.     For example, Galati Yacht Sales requires its brokers to be "certified professional Yacht brokers earning their designation from either the Certified Professional Yacht Broker[21] or the [IYBA]."[22]

89.     Brokerage Defendants maintain direct control over IYBA and YBAA in order to maintain their conspiracy and enforce the Broker Rules.

90.     IYBA's board of directors includes Charles A. Cashman, employed by Defendant MarineMax, Jon Burkard, employed by Defendant Allied Marine, James Corts, employed by Defendant MarineMax, Bob Denison, employed by Defendant Denison, and Michael Scalisi, employed by Defendant HMY Yacht Sales, Inc.

91.     YBAA's board of directors includes William Bolin, who is employed by Defendant S&J Yachts.

---

[21] A "partner association" of YBAA and IYBAA.
[22] Working with a Yacht Broker, https://www.galatiyachts.com/working-with-a-yacht-broker/ (last visited March 25, 2024).

92.     Plaintiff's and the Class's injuries are a result of a concerted scheme among Brokerage Defendants to implement the Broker Rules. The conspiracy relies on the cooperation of each Defendant.

**V.      The Conspiracy Has Caused Plaintiff and the Class to Suffer Antitrust Injury.**

93.     Defendants' conspiracy has had the following anticompetitive effects:

a.  Yacht sellers have been forced to pay commissions that are higher than what sellers would pay in a competitive Yacht brokerage market;

b.  Yacht sellers have been forced to pay the commissions for buyer-brokers even though those buyer-brokers provide no services whatsoever for seller-brokers in those transactions;

c.  Yacht sellers have paid inflated buyer-broker commissions and inflated total commissions;

d.  Price competition among seller-brokers has been restrained;

e.  Price competition among buyer-brokers has been restrained;

f.  Competition in the market for the sale of Yachts has been restrained due to Defendants' efforts to restrict buyers from accessing critical information such as, for example, prior sale price; and

g.  Defendants have increased their profits by receiving inflated buyer-broker commissions and inflated total commissions.

94.     There are no pro-competitive effects of Defendants' conspiracy, and to the extent any pro-competitive effects exist, they are substantially outweighed by the conspiracy's anticompetitive effects on the Yacht brokerage market.

### RELEVANT MARKET AND DEFENDANTS' MARKET POWER

95.     The relevant market for the claims asserted herein consists of the services provided to Yacht buyers and sellers by Yacht brokers with access to the Yacht MLSs. Defendants' control of the Yacht MLSs allows Defendants to impose the Broker Rules and other anticompetitive rules on a class-wide basis. Access to the Yacht MLSs is critical for brokers to compete and assist Yacht buyers and sellers.

96.     The relevant geographic market for the claims asserted herein is the United States. Unlike real estate, which is inherently local, Yachts are transportable and delivered all over the United States.

97.     Nearly all Yachts sold in the United States were listed on one or more of the Yacht MLSs by brokers subject to the Broker Rules.

98.     Defendants and their co-conspirators collectively have market power through their control of the Yacht MLSs.

99.     Any brokers who wish to compete outside of Defendants' anticompetitive restraints would face insurmountable entry barriers. Defendants' control of the Yacht MLSs means that non-conspiring brokers would need to establish an alternative listing service to compete with the Broker Defendants, or, alternatively, attempt to compete without access to a listing service. Such seller-brokers would lack access to most potential buyers, and a buyer-broker representing a buyer without a listing service would lack access to most sellers and any prior sales data. Simply put, brokers cannot compete without access to a listing service.

100.    Prospective Yacht buyers would also be reluctant to retain a buyer-broker operating on an alternative listing service that requires the buyer to pay the buyer-broker its

commission directly when the buyer could otherwise obtain the services of a buyer-broker for free.

101.     Yacht sellers would similarly not retain seller-brokers using an alternative listing service with no track record of success and without the traditional means of attracting buyers without inflated buyer-broker commissions.

## CLASS ACTION ALLEGATIONS

102.     Plaintiff brings this action under F.R.C.P. 23(a), (b)(2), and (b)(3) on behalf of itself and the following class ("Class"):

> All persons in the United States who, from March 26, 2020 to the present ("Class Period") used a Yacht MLS to sell a Yacht and paid a commission to a Brokerage Defendant or a broker affiliated with one of the Defendants.

103.     Specifically excluded from the Class are Defendants and their officers, directors, employees, affiliates, legal representatives, heirs or assigns; federal and state governmental entities; any judicial officer presiding over this action and the members of his/her immediate family and judicial staff; any juror assigned to this action; and any co-conspirator of Defendants.

104.     **Numerosity**. Because such information is in the exclusive control of Defendants, Plaintiff does not know the exact number of the members of the Class. Due to the nature of the trade and commerce involved, Plaintiff believes that there are thousands if not tens of thousands of members in the Class and that they are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all class members would be impracticable. Class treatment is the superior method for fairly and efficiently adjudicating this controversy.

105.     **Class Identity**. The above-defined Class is readily identifiable and is one for which records should exist.

21

106.    **Typicality**. Plaintiff's claims are typical of other class members' claims because all class members were injured by Defendants' alleged conspiracy and uniform conduct. Accordingly, by proving its own claims, Plaintiff will necessarily prove the other class members' claims.

107.    **Common Questions Exist and Predominate**. Common legal or factual questions exist as to all members of the Class. The nature of Defendants' unlawful anticompetitive conduct was and is applicable to the Class as a whole. Such questions include:

  a.  Whether Defendants conspired to require the Class to pay an inflated total commission of the Yacht's sale price;

  b.  Whether Defendants conspired to require the Class to pay the buyer-broker's commission;

  c.  Whether Defendants conspired to require the Class to pay inflated buyer-broker commissions;

  d.  Whether Defendants implemented and enforced the conspiracy through their ownership or control of the Yacht MLSs;

  e.  Whether Defendants' conspiracy and implementation of the Broker Rules harmed competition;

  f.  Whether the competitive harm that resulted from the conspiracy alleged herein outweighs any competitive benefits; and

  g.  Whether a common methodology exists to measure the amount of damages to which Class members are entitled, and the amount of such damages.

108.    **Adequacy.** Plaintiff can and will fairly and adequately represent and protect the class members' interests and has no interests that conflict with or are antagonistic to those of the

Class. Plaintiff's attorneys are highly experienced and competent in antitrust and class action litigation.

109.    **Superiority.** Class action treatment is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted because such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would require. The class mechanism can provide injured persons a method for obtaining redress for claims that might not be practicable to pursue individually. Plaintiff anticipates no undue difficulties in the management of this class action.

110.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

111.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## INTERSTATE TRADE AND COMMERCE

112.    Defendants' conduct as described in this Complaint was intended to and did occur within the flow of, and has had a substantial effect on interstate commerce, including in this District.

113.    Defendants' conspiracy has had a direct, substantial and reasonably foreseeable effect on interstate commerce.

## CLAIM FOR RELIEF

**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**

114.    Plaintiff incorporates and realleges, as though fully set forth herein, all allegations in the preceding paragraphs of this Complaint.

115.    Defendants have engaged in an anticompetitive and illegal conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act by requiring Yacht sellers to pay a buyer-broker commission and an inflated total commission to seller-brokers.

116.    As part of their illegal conspiracy, Defendants and their co-conspirators have:

    a.    Created, maintained, and implemented the Broker Rules and other anticompetitive IYBA and YBAA rules;

    b.    Created, maintained, and implemented the rules of the Yacht MLSs that implemented the Broker Rules; and/or

    c.    Required that their brokers include provisions in their brokerage agreements that require sellers to pay buyer-broker commissions.

117.    Defendants' conspiracy has, among other things, (i) required sellers to pay the buyer-broker commission; (ii) required sellers to pay an inflated total commission and an inflated buyer-broker commission; (iii) restrained price competition among buyer-brokers; and (iv) restrained price competition in the market for Yachts by withholding important information on Yachts necessary for determining fair prices.

118.    Defendants' anticompetitive and illegal conspiracy has caused buyer-broker commissions and total commissions to be higher than they would be in a competitive market.

119.     Plaintiff and members of the Class paid inflated commissions in connection with the sale of Yachts listed on the Yacht MLSs. Absent Defendants' anticompetitive conduct and implementation of the Broker Rules, Plaintiff and the Class would have paid lower commissions.

120.     As a direct and proximate result of Defendants' ongoing anticompetitive conduct, Plaintiff and the Class have been injured in their business and property and suffered damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of itself and the Class, respectfully requests judgment against Defendants as follows:

(1)     That the Court determine this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and direct notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

(2)     That the unlawful conduct alleged herein be adjudged and decreed an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

(3)     That Plaintiff and the Class recover treble damages in an amount to be proven at trial;

(4)     That Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing

the conduct alleged herein, or from entering into any other conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

(5)    That Plaintiff and the Class be awarded pre-and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint;

(6)    That Plaintiff and the Class recover their costs of suit, including reasonable attorneys' fees; and

(7)    That Plaintiff and the Class have such other and further relief as the Court deems just and proper.

## TRIAL BY JURY DEMANDED

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, on all issues so triable.

Dated:  March 26, 2024               Respectfully submitted,

                                 s/ Kevin B. Love
                                 Kevin Bruce Love
                                 Florida Bar No. 993948
                                 **CRIDEN & LOVE, P.A.**
                                 2020 Salzedo Street, Suite 302
                                 Coral Gables, FL 33134
                                 Tel: 305-357-9010
                                 Email: klove@cridenlove.com

Michael J. Boni (pro hac vice application forthcoming)
Joshua D. Snyder (pro hac vice application forthcoming)
John E. Sindoni (pro hac vice application forthcoming)
Benjamin J. Eichel (pro hac vice application forthcoming)
**BONI, ZACK & SNYDER LLC**
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Tel: 610-822-0200
Email: mboni@bonizack.com
        jsnyder@bonizack.com
        jsindoni@bonizack.com
        beichel@bonizack.com

William J. Leonard (pro hac vice application forthcoming)
**OBERMAYER REBMAN MAXWELL & HIPPEL LLP**
1500 Market Street, Suite 3400
Philadelphia, PA 19102
Tel: 215-665-3000
Email: william.leonard@obermayer.com

Roberta D. Liebenberg (pro hac vice application forthcoming)
Paul Costa (pro hac vice application forthcoming)
**FINE, KAPLAN & BLACK, R.P.C.**
One South Broad Street, 23rd floor
Philadelphia, PA 19107
Tel: 215-567-6565
Email: rliebenberg@finekaplan.com
        pcosta@finekaplan.com

Jeffrey Gittleman (pro hac vice application forthcoming)
Megan Jane Talbot (pro hac vice application forthcoming)
**POGUST GOODHEAD**
Eight Tower Bridge
161 Washington Street, Suite 250
Conshohocken, PA 19428
Tel: 610-941-4204
Email: jgittleman@pogustgoodhead.com
        mtalbot@pogustgoodhead.com

Jeffrey J. Corrigan (pro hac vice application forthcoming)
Jeffrey L. Spector (pro hac vice application forthcoming)
**SPECTOR ROSEMAN & KODROFF, P.C.**
Two Commerce Square
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: (215) 496-0300
Email: jcorrigan@srkattorneys.com
        jspector@srkattorneys.com

*Counsel for Plaintiff Magna Charter, LLC and the Proposed Class*